All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning everyone. The panel has before us only one case for argument. Case number 07-1240 Verizon Svcs v. Vonage Hlds. Mr. Ware. Good morning to you. Welcome. Please proceed. The trial court committed reversible error in this case by refusing to construe before the jury two disputed claim terms. Translation and destination address. With respect to both, excuse me, translation and destination address. With respect to both... There were a number of claim terms that you were saying he misconstrued. Well, I would say he failed to construe. He gave no guidance to the jury with respect to either of those terms. With respect to each of the claim terms that you're raising, are we dealing with a situation in which you're claiming that the construction was either, rather than that it was wrong? No, I don't think that's true with respect to the first two terms I've identified, which are translation and destination address. Because I think the error is one that this court has commented on repeatedly. That if there are disputed claim terms, and those two terms were disputed, they were disputed at the Markman hearing, the trial judge, not the jury, is the proper place for disputed claim terms to be decided. Here, the two terms, translation and destination address, were disputed. Vonage proposed the definition... In each one of these instances, including these two, your contention, it seems to me, is that the construction was incomplete. Not that he said something that was wrong, but that he should have said more, which would be limiting to the term. Well, it's incomplete in the sense... Am I correct or not correct? Yes, you're correct, and let me answer further if I might. It's incomplete in that, for those two terms, he gave nothing. Now, with respect to some of the other terms, for example, his definition of local wireless gateway system, he gave a completely meaningless and ambiguous definition. For that term, he gave a definition that said a limited or local area. That provides no guidance, no assistance to the jury. So it's not that it's incomplete, it's ambiguous and provides no guidance. So we've got situations with respect to two claim terms where the trial court erred in a way that this court has repeatedly said is an error to not construe disputed claim terms. He didn't construe them at all. He said nothing to the jury about the meaning of either of those terms. And the mischief that that permitted was evidenced by one of the early questions that the jury asked, which was, can you give us guidance with respect to the meaning of translation? There was a dispute as to what translation meant. We believe that the construction that we gave was consistent and in plain language meaning as understood by one ordinary skill in the art. There was no dispute. All of your contentions with respect to the 574 and the 711 patent terms involve contentions that the embodiments disclosed in the specification should result in a limiting of the claim terms. Isn't that true in respect? That's across the board in each one of the claim terms. It's partially true, but it's incomplete in the sense that we do make the observation that with respect to the claim constructions that we offer, that our claim constructions do not read out any of those embodiments. But that's not the basis of our construction if you go through each of the constructions that we have offered. With respect to conditional analysis is a good example. Conditional analysis is not a plain and ordinarily understood meaning. It was disputed. And so in a case where you don't have a plain meaning to a claim term, you are required in the teachings of this court to go to the specification. And so what we did in that instance for our claim definition, we have a disputed claim term. It's not a plain language claim term. But what is there in addition to the embodiments argument, which we seem to have rejected and felt with respect to any of those claim terms in the 574 and 711? Well, with respect to conditional analysis specifically, the present invention language, which this court has regularly said, when you have not a plain language term and you are required to go to the specification, the first place you go is to the present invention language. And with respect to the 711 and 574, we've gone to the present invention language with respect to the definition of conditional analysis. And we've quoted in our briefs. What does the present invention language say about conditional analysis? Well, with respect, we believe that the present invention language indicates that it's consistent with the... Excuse me. I've misspoken here. Let me try to correct that. We think that with respect to conditional analysis, the argument that we've made is consistent with the prior arguments described. The present invention language, I thought, was with respect to terms in the 880. Well, it's also with respect to the 711. What specific language? I would like to refer you to two or three citations. Number one is column four. This is the 711 specification. That's correct. Come on. Column four, 41 to 47. And then further supporting that present language interpretation is column five. Okay, but what is the language in column four? Okay. What is that language? The present invention relates to an enhanced server for the translations of names and the like into address information, networks or systems utilizing such a server, and methods translating names into address information to provide customers with a wide range of sophisticated routing options to provide customers. Now, our definition of conditional analysis is that it responds to a call party need. It doesn't respond to the service provider needs. It doesn't respond to the calling party needs. So that's what the dispute is all about. And we think the present invention language on a non-plain language term, which talks about responding to the call, to the call, excuse me, to the customer needs, particularly when read in the context of the existing domain name system, which is described there, and the AIM system, which is described earlier. Now, that's the present invention language that we refer to. But if you look further, immediately after the present invention language and consistent with that language, at column five, two to 11, the sentence begins, the called party can subscribe to a selective routing service, and selective routing service is customized to meet the subscriber's individual routing needs by customizing and routing control records that control conditional analysis responsive to translation requests relating to the customer's needs. Now, the term we're defining is conditional analysis. If you look at the specifications, the first time that word appears in the specifications is in that sentence I just read. And so the first time the inventor describes conditional analysis, immediately after the present invention language, which is talking about customer needs, in the context of existing AIM telephone network customer needs and domain name system, the first time the term is used, it talks about the called party needs. And the called party is the one that's giving routing information. I, the called party, say I want my call, if I'm not here, to go to voicemail. I, the called party, if I'm not here, want my call to go to another telephone number, where I would be. And so we believe that with respect to conditional analysis, that... Well, we think it does meet the needs. But you're saying that we should limit this. No. Well, for example, on an outbound call, the example of infringement that Verizon gave was that the call from a bonded subscriber outbound, conditional analysis takes place. Because there are two destination addresses given. One of those is the destination address of the party being called. Under conditional analysis, you need a first result and a second result, the first destination and the second destination. And in that case, it was call block. If I, the bondage customer, have not paid my monthly bill, then the subscriber cuts off my service. That is not conditional analysis within the meaning of this pattern. But that was the example... ...only form of conditional analysis that's performed in the bondage system? With respect to the outbound call, that was the only example that was given by Verizon at trial. And if we analyze the call flow back the other way with respect to inbound calls, we also believe that in those circumstances, the result is the same, particularly when you combine our definition with destination address. Because destination address... ...on the inbound calls, what's the conditional analysis in the bondage system? Well, the argument would be that the conditional analysis is that the bondage system gives a one result or another result with respect to inbound calls. And in those circumstances, we believe that if that situation is analyzed, that you would not have a conditional analysis resulting in a destination address, which is an in place. We read the terms together. So if you read the terms together, destination address and conditional analysis, you would not have infringement as described. But that depends on our reading of your definition of destination address. The example I gave certainly does in that instance. So, Mr. Warren, when you were on the destination address issue, you had submitted a request to the court for a definition limiting the address to the quote, the final end point of the packet network. That's correct. The court rejected that and said it should be just a standard definition as well known by the jury. So there was no definition that you had submitted that you accepted. How does that definition help your understanding of 7-11, patent 7-11? Why would not the bondage use of the IDS system then still be a destination address which would be infringing under the 7-11 law? Under the 7-11 patent, which is the one that requires conditional analysis, and if you look specifically at the terms of the 7-11 patent, it requires that there be a first destination address and a second destination address. And that destination address, the first and second, must be used for establishing communications at least partially through the public packet data network. Now, with respect to our definition of a destination address, we think that there would be, I'll get back to your exact question in a minute, no infringement with respect to the 571. Now, with respect to the 7-11, with respect to destination address, we believe that there's a difference in call flow with respect to how you would analyze it and that there are intermediate addresses that are given, the RTP relay of the access to the voicemail system and things of that sort, which are not the end point of the public packet data network. When you analyze what happened here at trial, and I notice that my light is on, so I'll finish answering the question. When you analyze here what happened at trial, the fight was about whether or not an undefined term, destination address, the judge gave no guidance at all. It's important to look at the difference between the Markman instruction and the ruling and the trial court ruling because in neither place with respect to destination address does the court give a definition of destination address. But it was disputed. We argued that intermediate hops, RTP relay, voicemail access, those were the results of the translation, were not a destination address. And so that if the result of the translation is an intermediate address and not a final address, then we would not be infringing. And so under our interpretation, if you go through the call flow with respect to a substantial number of calls, under that analysis, if we had gotten the instruction, there would have been a more articulated presentation of evidence for the jury so the jury could decide whether or not there were any infringing calls. But given the fact that the judge failed to define it at all, the jury was left to hear Verizon's experts saying that intermediate hops could be a destination address, which we believe, and we pointed out, is directly inconsistent with the specification which distinguishes intermediate hops from the destination address. Intermediate in the sense of the RTP? Yes. Do you use RTPs in all of your systems? The RTP relay is used in what's called a NAT-ed environment where the ultimate address, the IP address of the user, is not revealed in the message that's sent back. All that is revealed, it's like it's cloaked. All that is revealed is the intermediate address, and then you go to that intermediate address, and that RTP relay then forwards it on. And there are a very substantial number of Vonage subscribers that the method in which they've chosen to subscribe to the Vonage system is in a NAT-ed environment, cloaked environment, so that the ultimate destination of the IP address is not revealed to the calling party. That same thing would be true with respect to other intermediate stops that operate. We have a dispute with Verizon as to whether or not voicemail is a final destination. That's a second example from our point of view of an intermediate destination because the voicemail system is not the endpoint on the public backup data network. It is just an access point to further endpoints, which are voicemail service provided by our voicemail service provider, which is a service that is outsourced. But the voicemail address, would that be the second destination address? Yes, it would be a second destination address. Absolutely correct. We don't dispute that. But the second destination address in our definition has to be an endpoint, not an intermediate. And so the dispute was not one that you see argued about a little bit in the briefs as to whether or not destination address could include the destination telephone. We don't dispute that it could include. In fact, the patent specifically says it can include the destination telephone number. So that wasn't what this dispute was about at trial. It's whether or not the phrase in the patent, destination address, in the 7-11 patent, which was defined in the claim, Claim 20, as an IP address, whether or not that was an intermediate IP address. In effect, rooting for intermediate hops or stops, as we had to stay hearing the example of Philadelphia, the train going through Philadelphia on the way to New York. And it's our contention that if you understand those two terms, which were not defined, destination address and translating, as they would have been understood by one of ordinary skill in the art, not a layperson, there was not a dispute between the parties as to what was necessary for one of ordinary skill in the art. It was agreed that you needed a computer science or computer engineering degree. It was agreed that you needed two to five years' experience in either internet telephony or the telephone system. So the question is to allow a lay jury that doesn't have that background. Lay juries do not constitute one of ordinary skill in the art when you're dealing with technology such as this. To allow a lay jury to speculate as to what the terms destination address and translating, with no guidance from the court, allows for the kind of mischief we have. But what about the fact that you didn't object? I mean, you're arguing for this utility exception, which does exist in some circumstances. But I understand your argument correctly to have a plain construction hearing where 40 terms are constructed. No objection to the jury instructions, and then the jury verdict becomes vulnerable if we on appeal decide that any one of those 40 terms was construed wrong at the market. I think the important consideration, it's a very clear question, Judge Dyke, is what's the purpose of a futility trial? And as this court has said, and I believe in the opinions that you may yourself have offered, that the idea is was the trial judge fully and fairly advised of the arguments of the parties so that he had an opportunity to consider them? There's no question that that happened here. Let's suppose there are 40 plain construction terms that are construed at a market here. Does the jury verdict become vulnerable if there's a mistake in any one of those, even though it wasn't raised at the charge conference? I believe that that's consistent with this court's reading of the futility doctrine. I think it's also consistent... Do you have to go that far to help you here? Well, I don't think you have to go that far to help me because you only have... We don't have to thank God you're hypothetical. We simply have... Well, the difference is the starting point that I had here today, which is there are two claim terms that were not defined. And so this court has regularly said that it is not the business of a jury to be defining claim terms as they would be understood by one ordinary skill in the art when they are disputed. And so with respect to those two, I think it's a fairly easy inquiry. And then we have a limited number of claim terms beyond that. So if the question was, and I think this ultimately ought to be the question for the court, would it have made any difference? The reason that the rule exists is so the trial judge has an opportunity to change his mind. Well, under these circumstances, there's going to be no doubt that Judge Hilton wasn't going to change his mind. He'd had the opportunity to consider the briefs. He'd had the opportunity to make his Markman ruling. He, in fact, for his Markman ruling, simply took substantial portions of the Verizon brief and adopted it as his ruling. And so the notion that if we had objected, it would have saved this court some work because the trial judge might have reached a different conclusion is really not likely in these circumstances. Well, I don't think that's exactly the point. I think the question is at the end of the trial, after the evidence is in, you know what the disputes are between the parties. Doesn't counsel owe it to the trial judge to say these are the key issues that still matter and we want you to instruct the jury in these five respects so that the judge knows what the focus of the dispute is. He doesn't have to worry about 40 claim terms coming back to haunt him on appeal. Well, in that hypothetical, or the hypothetical the court's given with 40 claim terms, you may reach a different conclusion. That's not this situation. But let me be very clear. The decision as to whether or not the futility doctrine applies, as this court pointed out and echoed that, is a decision for this court to decide whether that doctrine applies in the various circuits. And so you look to see whether or not the Fourth Circuit Court of Appeals has recognized the futility doctrine. They have. And in recognizing that in the college-state decision, they talk about the same factors I've discussed here this morning, which is the issue is, was the trial judge fully or fairly involved? In cardiac pacemakers, we had a situation very similar to this. There was a Markman hearing. There was a Markman ruling. It took place before the trial. There was no objection at the charge. And at that point, the court found that it was not necessarily futile to have done so. Further evidence of the futility came when we had a question from the jury with respect to this issue of transit. And at that time, Mr. Doyle said, Your Honor, as you know, we dispute and continue to dispute your Markman ruling, and the response was, right. And so the likelihood that in this circumstance there would have been a change of the trial judge's position is, as I say, remote in the extreme. I see my red lights on, so thank you very much for your time. Thank you. We'll restore the bottle time you sought to reserve. Mr. Toronto, we'll hear from you now. You're entitled to 28 minutes for parity. Thank you. Thank you, Your Honor. If I may, I'd like to start briefly with this jury instruction point. The fact is this court's serial U.S. case remains the closest case about waivers, failure to object to jury instructions on claim construction issues. It's the only case involving both Fourth Circuit law and the post-2003 Rule 51. It also is a case in which this court limited review to plain error despite the fact that the issues were fully presented to the court. In fact, they were pending before the court the claim construction issues were pending. That's not enough. What's important, in all of the cases that talk either about futility, and I should mention there is no case yet in any appellate court involving futility under the post-2003 Rule 51, but passing that, the only cases cited here by Bonner are the City of Richmond case from the Fourth Circuit, which rejected the futility exception where there was no basis in anything the district court had said to indicate that it was futile, even though they knew it. I'll tell you what their problem is, that it's hard to reconcile serial with some of these other cases. Someone reading the case law as it was not in this jury trial could have thought, could have thought it was sufficient to have raised the issue at the markment. I think somebody reading them at the time would have first said, the rule has changed. It's now the 2003 version of Rule 51, which even more says, appears to provide the exclusive means for challenging failures to incorrect jury instructions or omissions from jury instructions. So all the cases predate 2003, but in addition, if you go and look at the cases, for example, the two cases from this court, the Cardiac case and the College Net case, College Net itself says at 1234 that there was an objection made in the jury instruction papers. Cardiac says sometimes a resolution of claim construction issues before the trial can be enough to render it futile, but it doesn't say why it was there. So if you then go look at the Appellee's brief, you will see expressly that the court there said during trial, this is final, admonished the counsel to stop arguing about it and told the jury that issue is over and done with. Nothing like that happened here. Well, something somewhat similar happened here, didn't it? I mean, in the sense that this is a page four of a slide during the deliberations that said they objected to claim construction and continues to object. Oh, that was of course after the case had gone to the jury. They are referring explicitly there to the discussion when the jury came back with a note, by which time, of course, it is too late. And of course, what the old rule said, what the new rule says is you have to make your objections before the jury retires. Serial U.S. is explicit about that carrying forward into the new rule. That citation is post-deliberation. But what degree of specificity do you need to make the objection? They have submitted their own jury instructions. Yes, they do. They were rejected by the court. There were no claim constructions in those jury instructions. None at all. There were no claim constructions requested by them on the jury instructions? That's exactly correct. You look in the joint appendix, their proposed jury instruction says here's the language of the claims, nothing about claim construction. Not there. That might well have been enough, had they then said in the proposed jury instruction, here's what we think the claim constructions ought to be. They didn't. Now, under the new Rule 51, the rule pretty much explicitly says even that might not be enough. You also have to object unless the judge on the record has already rejected the proposed jury instruction. But they did not do that here. That's why this is a quite naked case of no presentation of the claim construction issues in the jury instruction process before the jury retired. But you're not arguing under the waiver of the Markham Hand provisions. You're arguing that under Rule 51 they had to make specific jury instruction requests. Right. There are two separate kind of waiver points. One is selective as to particular claim constructions. The other is a global point about the jury instructions. So let me mention the one other case that's discussed here. There are these two Fourth Circuit cases. The City of Richmond one, which expressly says, although under the old rule there is a futility exception, it is not enough to simply assert that it would be futile. And so they applied plain error review. The other one, the Collins Loan case, is a peculiar case because it involved a pretrial disposition of claims, a pretrial dismissal, which of course was independently appealable after a final judgment, quite without regard to what the labor jury verdict was, that the appellant was entitled to say some of our claims were dismissed. We're entitled to get back those claims by reversing the preemption ruling. And once you did that, of course, the jury verdict on a truncated set of claims had to be set aside. So it's not really a Rule 51 case at all. We, of course, don't have a pretrial disposition of any claim. So what we have here is serial U.S. as, I think, far and away the closest case. If I can... You do have a denial, though, by the judge of refusing to interpret certain claims of language, both the translation and the destination address. Well, no, no, I don't think that's right because what the judge said to the jury expressly was, these terms take on their ordinary meaning. That is, it's not a separate and express construction, but it's not a refusal to consume and say, wait a minute. The Markman hearing, he did refuse to especially to accept one of his specific determination on those two main languages. Yes, he rejected both of their constructions on destination address and conditional analysis Right. So on that basis, is that really a waiver at that point in time? I think for the... To be carried over to the jury? I think for the jury instruction purposes, it is. The point, as I think Judge Dyke was mentioning, of this really quite strict Rule 51 about jury instruction is that, let me talk about it in the context of claim construction. This court has said in the Jack Gutman case that rolling claim constructions are permitted. The court has said in the Wilson-Sporting Goods case that Vonage cites in its reply brief that determining exactly what the claim construction ought to be and which issues require clarification is importantly informed by the record of what's being accused. That makes it all the more important to get a final, clear set of objections made and objections resolved at that last clear chance for telling the jury what the law is. Otherwise, what you have is this process whereby you're going to get a do-over with an extraordinarily expensive trial for enforcing patent rights having to be done again because the judge wasn't told at that last moment when the law, claim construction law, was being given to the jury, what exactly was being objected to by the party. That's why the earlier ruling before any of the evidence has come in, before the judge has truly learned through the process of trial what's at stake and understood more of the process than perhaps it did at the earlier proceeding is important. If I can't give you the time of the hearing, there were no determinations made by the judge on those two points. And it just translated, I'm sorry, it was just pushed back to the time of the jury inspection. So, if in fact the judge refused to accept the definitions submitted for those two terms, by Vonage, is that a futility type of an aspect by requesting later on saying we want you to do it at that point in time? No, I think there are two possibilities if I'm understanding it right. One is to read the pre-trial rule of those proposals and it was all the more incumbent on Vonage to tell the judge when it came time to instruct the jury. There remains this proposal we have that you haven't quite fully rejected. I think in fact the better view is that he did reject Vonage's proposed claim constructions at the Markman stage. But that isn't enough to excuse the failure even in proposing jury  at the beginning of the trial let alone in the jury instruction process at the end of the trial before the case went to the jury to raise the issue again and say your honor we now understand something better let me try again and make clear to you why what you said before the trial isn't really enough. And Vonage hasn't pointed to anything in which the judge before that said I don't want to hear anything from the jury. It also hasn't pointed to anything that happened in the trial that made essentially an irreversible kind of decision which would have made perfectly clear that the judge could not possibly have changed its claim construction along the way. What we have here is just a naked assertion that the patent is not enough. Let's talk about some of the actual claim construction. I would understand your point. The 880 patent talks about localized wireless gateway systems. And they say if I understand correctly that localized is limited to a few feet based on the prosecution case. They do say that the patent ought to be limited to a few feet. There's a peculiar line at page 20 of the reply brief that says maybe that argument doesn't have to do with the term localized but I don't really understand that sentence so I think they really do mean localized has to be a few feet. That's the way I understand it. And you've got this prosecution which is a problem for you. And you've got the Microsoft case which I don't want to say too much about. The Microsoft case is a problem for you because if I understand what was said in Microsoft it was even if the prosecution history came with respect to the later issue it's still relevant to claim that structure. So it seems to me that the Microsoft case says that we can and should look at this later prosecution history in which they talk about the possibility of prosecution history. What's the answer to that? We have not taken issue with the Microsoft proposition that a piece of post-issuance prosecution history can accomplish as Microsoft said it did there. It cleared this about. What we say is that this one didn't. By looking at the particular pieces of prosecution history, there are only two statements. They're at 7189 and 7191 of the appendix. The first one is unambiguously only exemplary. It says such as for example. It talks about cordless phones, such as for example. It's not limiting. It's unambiguously not limiting. The other one is the one that I think it is fair to say might well be ambiguous, but ambiguity isn't enough. What that one says is it refers to the local wireless in the sense of a cordless phone that is restricted to operate within a few feet from a base station. The better reading, but it only has to be one reasonable reading, is that that means a few feet range cordless phone and its base station are a localized system. It's giving the cordless phone as an example of the kind of island-like system that the patent otherwise repeatedly talks about as the defining characteristic of at least the localized wireless gateway system. So even that language is at best ambiguous. In fact, I think it's better read to simply mean a cordless example in the sense in which the cordless phone is that kind of island-like system. And there are a couple of reasons for that. One is that as Vonage accepts, the prior art being distinguished doesn't talk about numerical ranges. So it would be sort of surprising to think that the statement in this prosecution history has the same meaning that the specification is otherwise conveying, which is on the one hand we have wide area coverage systems like cellular systems and that's not what we're talking about. On the other hand, we have these island-like systems in which wireless coverage is limited to some kind of area with vast, in an ocean of non-covered areas. So I think that this statement simply cannot rise to the level of a clear disavowal. It may well be, I think that's really our point of that. We're not talking about the present invention language in the ADA with respect to the plurality of base stations and compression charges. Those points come down to this column four present invention language and as you'll know from our brief, we think that in this case that doesn't rise to the level that, for example, the Honeywell case about where Honeywell had an unambiguous statement, this invention relates to fuel filters. And what happened later was that in a divisional application, a division, a restriction not based on distribution, changed the language from the material to suddenly expanded to fuel injection components, fuel injection system components beyond fuel filters. And so it had an unambiguous statement, this relates to fuel filters and the court held Honeywell to that. What we have here is something that is not that kind of unambiguous statement. It says in one aspect the present invention involves these things. So on its face not as ambiguous. Continue on to the other points. Undisputed between the experts here that a person of skill in the art would know, as the patent says with respect to computers, computers that can download soft phone software to operate wirelessly, the computers can already do the compressor. So you wouldn't think that this patent was limited in some way to devices that couldn't themselves do the compressor. Next of course what you have is continuing on in column four. The first one says in one aspect the present invention does this. It then describes other aspects and the PTO first office action recognizes what we have here are independent and distinct inventions and they restrict them. And contrary to what Bonner says, they don't restrict them because one is a method and one is a system. The ordinary law of patents, that's not a good enough reason to impose a restriction requirement. In fact, the examiner said one invention to a class and the other one belongs in a different class and subclass. If you just look at those classes and subclasses, both of them involve both systems, apparatuses and methods on both sides. So there's not a distinction here being made in the restriction requirement between methods on the one hand and systems on the other hand. It's a substantive distinction about the subject matter of the two different inventions that underlie the restriction. And one involves this home location registration database and the process of registering. That's ours. And the other involves the localized wireless gateway system that eventually became the 497 patent, which is not at issue here. So those reasons all indicate that this is not a strong enough kind of present invention language to fall into that narrow class of cases like Honeywell. The final point, of course, which I want to make is as to both of these points, the compression point and the plurality of base station points, if you look at the original claims in the patent, you'll see that the language separately addresses those. It says a localized wireless gateway system with a packet service gateway that also compresses for that. It also involves a plurality of base station transceivers. Phillips indicates the power both within particular claims among independent and dependent claims and among two different independent claims of the distinction when a patentee uses language A and B. B is typically not implied into A. So the plurality is more than that. We haven't disputed that here. In the ordinary course, I think it does, yes. And I should say there is nothing as to that particular piece, the plurality of base station receivers, that in any way seems to relate to what the home location registration database invention is about. Recall, as Ron had stressed in his reply brief, the home location registration database is about finding a gateway. And we're not talking here about how many different gateways you have. Vonage says that within a particular gateway system, you have to have multiple base station receivers. How many base station receivers are attached to the particular packet service gateway has nothing to do with any of the elements of this claim using the home location registration database, which is the invention claimed in the 880 as opposed to the one in the present invention. And so, in that sense, there wouldn't be this necessity, necessary limitation. But at least there, one couldn't, one would have to say well, the description of this first aspect of the present invention in column 4 at least applies to the invention being claimed in that patent. Here we don't even have that. I have a question pretty much in conjunction with the issue. Can I make just a couple of points about the 574 and 711 before we get to it. If you look at the 574 and the 711 and ask what kind of conditional analysis is being talked about, there is no present invention language there that limits it. And indeed, there's a specific example, the drugstore example at column 15, line 55 to 65, where it's perfectly clear that the caller's need is being served. And when column 4 is being referred to customers, it doesn't say customers have to be on the receiving end of the call. The customers can be in fact the makers of the call. The other two quick points. Ask the question, what prejudice is there from any error that there might have been either conditional analysis or destination interest? We, in our red brief, said Bonnachat has shown what the prejudice is. So in their reply brief, they come back and as to each of the patents, they say here's what the prejudice is. As to 574 and 711, it's at page 15 of the reply brief. At page 15 of the reply brief, they don't mention a single aspect of prejudice for the conditional analysis for in-found cause. So this is, remember, an all-or-nothing jury verdict per patent. It's also all-or-nothing as to damages per patent. So even if they were right about conditional analysis being restricted to the call party's needs, they don't even say in their reply brief that all of the voicemail and call forwarding and other services for in-bound calls to Vonage customers are somehow outside conditional analysis. Same thing with destination address. Please, I'm sorry. Sorry for the detail. I'm going to ask my question about the injunction. We have a bit of a new world. They say no injunction. You say injunction. But isn't there kind of a middle ground in these cases where the injunction will put somebody out of business? Shouldn't that be a consideration in framing the injunction? Shouldn't the district court perhaps allow time for a worker as part of the injunction? In other words, your interest, Verizon's interest is in not losing customers. I'm not sure Verizon has interest in putting Vonage out of business. Shouldn't the district court under these circumstances consider whether the injunction should be framed in some way as to allow a reasonable time for a work around particularly where it is here it's nonverbal infringement? I don't think so. But let me start by saying I don't recall that there's any  on background. No, I don't think they raised that issue. But they did say in no injunction that a reasonable loyalty was sufficient. And you're saying the opposite. And I'm just wondering if there's some middle ground in these cases where the injunction would put somebody out of business, whether the district court shouldn't under those circumstances consider whether the injunction should be limited in such a way that there is  a work around. Well, in this case, of course, as a de facto matter, a stay process, there has been. But that didn't happen. It's only in various kinds of public statements that Vonage has been telling the world that    work around. But it did not, in fact, it said very much so. And I think the judge ought to say, look, it's the opposite to the district court. It said, you enjoin us, we're dead. And so at a minimum, I think, the kind of middle ground you're talking about. Well, how do you know that's inconsistent? They said you enjoin us, we're dead. But it didn't address the middle ground on the horizon yet. But it seems to me at a minimum to suggest that there is that kind of middle ground that a district court would be abusing its discretion to deny, which is I think what would have to happen here. I think the ultimate harm is one that can be stopped here through some sort of rule that the injunction takes effect in four months or something. But I think an open-ended give us some time but we have no idea whether the time does anything except continue the uncompensable harm, I think that is what we are  to do  I think that is what we are trying to do here. I think that is .